[Sac. No. 5248. In Bank.—April 21, 1939.]

JULIA VALLADAO et al., Appellants, v. FIREMAN'S FUND INDEMNITY COMPANY (a Corporation), Respondent.

MARY J. KATSULAKIS et al., Appellants, v. FIREMAN'S FUND INDEMNITY COMPANY (a Corporation), Respondent.

Appelbaum & Mitchell, Mervin C. Lernhart, Lewis H. Cromwell and Lewis N. Mitchell for Appellants.

Bronson, Bronson & McKinnon and John Painter for Respondent.

Nourse, Betts & Jones, Myrick & Deering and Scott and Charles H. Goebels, Jesse H. Steinhart, John J. Goldberg, Brown & Rasson, Cooley, Crowley & Supple, Crosby & Crosby, Donahue, Richards & Hamlin, Hadsell, Sweet, Ingalls & Lamb, Neumiller & Ditz and Redman, Alexander & Bacon, as *Amici Curiae,* on Behalf of Respondent.

WASTE, C. J.—The facts underlying this litigation are not in serious dispute and are practically conceded. It will facilitate matters, therefore, if we adopt, and we do adopt, the following rather full statement of facts heretofore employed in an opinion of the District Court of Appeal of the Third Appellate District when the cause was there pending:

"These actions were jointly brought by the plaintiffs against the Fireman's Fund Indemnity Company, a corporation, pursuant to the provisions of the statutes of 1919, chapter 367, being an action after judgments obtained by the plaintiffs against the assureds of the indemnity company had become final and executions returned unsatisfied.

"In November, 1935, plaintiff Julia Valladao and John C. Valladao recovered a judgment in the sum of $7,500

against Edwin J. Davis and Dave McClure, Jr., and on the same day plaintiffs Mary J. Katsulakis and John P. Katsulakis recovered a judgment against these same defendants in the sum of $1,000, which judgments were based upon personal injuries received by Julia Valladao and Mary Katsulakis in September, 1934.

"At the time of the accident there was in full force and effect a policy of insurance in the Fireman's Fund Indemnity Company, insuring Dave McClure, Jr., against liability imposed by law upon him for bodily injuries. It also extended coverage to any person legally operating the automobile covered by the policy.

"The jury returned their verdict in the present action in favor of the plaintiffs, and thereafter, notwithstanding the verdict, the trial court entered judgment in favor of defendant Fireman's Fund Indemnity Company. Thereafter a motion for a new trial on behalf of the plaintiffs was denied. This appeal is from [the] . . . judgment.

"There is little dispute as to the facts, which substantially are that defendant indemnity company issued its combination automobile liability and property damage policy to Dave McClure, Jr., which was in full force and effect and covered the truck being driven at the time of the accident. An omnibus clause also covered 'any other person or persons while . . . legally operating any such automobile . . . if such . . . operation is with the permission of the named assured . . .'.

"The accident happened on the highway north of Santa Rosa, about 10 o'clock on the night of September 24, 1934. McClure was driving his truck at the time, accompanied by one Bert Herbert and Edwin J. Davis. As McClure was proceeding along the highway he struck the rear of a car parked on the highway, in which car plaintiffs were seated. When the crash occurred McClure fled the scene of the accident without disclosing his identity to any one connected with the injured parties. [On two prior occasions McClure had pleaded guilty to and had been fined on reckless driving charges.]

"When a traffic officer arrived after the accident, McClure was still absent and Davis told the officer and those at the scene that he, Edwin J. Davis, was the driver. Davis had no operator's license in his own name with him at the time,

but had in his possession an operator's license belonging to his brother, John K. Davis. He concealed the fact that McClure had been on the truck and stated to the officer that his name was John K. Davis, whose operator's license he had. The officer then issued a citation for reckless driving in the name of John K. Davis and handed it to Edwin J. Davis. Davis accepted the citation, and in response thereto appeared in the justice's court, and at that time, still posing as John K. Davis, pleaded not guilty to the charge of reckless driving. The first knowledge that the indemnity company had of the accident was received on the forenoon of the day after it occurred, when McClure and Edwin J. Davis reported the accident to defendant's agent in Petaluma. At that time McClure and Edwin J. Davis appeared at the agent's office, and in McClure's presence Edwin J. Davis represented himself as John K. Davis, and told the agent that he was driving McClure's truck at the time of the accident. In answer to questions by the agent, Davis narrated the accident as though he were the driver and told the agent he had borrowed McClure's truck, and that McClure was not in the truck at the time, and that he and Herbert were the sole occupants of the truck, and that he had been arrested for reckless driving. Upon this statement of fact the agent prepared a written report and sent it to the indemnity company. A day or two following this report an adjuster for the defendant interviewed McClure and Edwin J. Davis, when they again confirmed the false statements made at the time of the first report. Some days after these reports were made McClure and Davis again went to the justice's court, at which time Edwin J. Davis, answering to the name of John K. Davis, entered a plea of guilty to the charge of reckless driving under the name of John K. Davis, and paid a fine therefor.

"On November 17, 1934, plaintiffs herein, suing separately, filed actions against McClure and John K. Davis; McClure was sued as the owner and John K. Davis was sued as the operator of the truck. The summons in the case were sent by the defendants to the indemnity company.

"In December, 1934, the indemnity company turned these cases over to its attorneys in Santa Rosa for the purpose of defending McClure and Davis. Early in January, McClure and Davis discussed the facts of the case with these attorneys, and they there repeated substantially the same story they

had theretofore told. On the same day, one of these attorneys, with Davis and McClure, visited the scene of the accident and went over the facts in the case, and the same falsifications and concealments were again narrated without correction.

"In due time answers to the complaints were prepared on behalf of McClure and John K. Davis, . . . and by them duly verified and then filed, [tho McClure denies having read same]. These answers affirmatively admitted that McClure's truck was being driven by John K. Davis, but denied negligence upon the part of the operator, and set up contributory negligence as a defense. Again, a month or two later, McClure and Edwin J. Davis called at the office of the attorneys representing them for the purpose of discussing their depositions, which were to be taken by the plaintiffs. At that time they again discussed the facts in detail and again made the same misstatements.

"On . . . the day . . . the depositions of McClure and Davis were to be taken they, accompanied by their personal attorney, Mr. Carpenter, called upon Mr. Murphy, a member of the firm of attorneys who had been retained by the indemnity company to represent them, and then and there informed Mr. Murphy the stories which they had theretofore told were false,—that McClure was driving the truck at the time of the accident, and that Davis was merely a passenger in the truck, and not the driver. At that time McClure also informed Murphy for the first time that he had run away from the scene of the accident and had concealed himself. He said he had done so for the reason that he had been in trouble prior to that time arising out of a charge of driving while intoxicated, and that he was afraid his driver's license would be revoked.

"Immediately following this disclosure Murphy communicated with the San Francisco office of the indemnity company, and then informed McClure and Davis that the indemnity company was withdrawing from their defense, and that Murphy himself and his firm were withdrawing as their attorneys. Murphy also immediately advised the attorney for plaintiffs that his firm was withdrawing as attorneys for McClure and Davis, and that no depositions could be taken at the time set. Later other attorneys were substituted as attorneys for McClure and Davis.

"An amended answer, setting up the true facts was filed, and it was stipulated at the trial that Davis' name was 'Edwin J.' rather than 'John K.'. At this trial, held November 10, 1935, judgments were entered in favor of plaintiffs and against McClure and Davis.

"In March, 1936, the present action was filed. To this the indemnity company set up as an affirmative defense a breach by McClure and Davis of the cooperation clause in the policy of insurance. After a verdict for plaintiffs, the trial judge granted defendant's motion for a judgment notwithstanding the verdict. . . .

"The cooperation clause contained in the policy issued by the indemnity company to McClure, and about which the issues here raised revolve, reads as follows:

" 'Co-operation of Assured:—E. The assured shall not voluntarily assume any liability, nor incur any expense, other than for immediate surgical relief, nor settle any claim, except at the assured's own cost. The assured shall not interfere in any negotiation for settlement, nor in any legal proceeding, but whenever, requested by the Company, and at the Company's expense, the assured shall aid in securing information and evidence and the attendance of witnesses, and shall cooperate with the Company (except in a pecuniary way) in all matters which the Company deems necessary in the defense of any suit or in the prosecution of any appeal.' "

Preliminary to a discussion of the issues here involved, it is well to point out that it is now definitely settled here, and in a majority of the states, that in an action of this character the injured person stands in no better position than the assured and that a violation by the latter of a cooperation clause which would serve to preclude the assured from indemnity under his policy will likewise bar the injured person from recovering against the insurer should the judgment in his favor and against the assured remain unsatisfied. (*Hynding* v. *Home Acc. Ins. Co.*, 214 Cal. 743, 746–751 [7 Pac. (2d) 999, 85 A. L. R. 13].)

It may not be denied that aside from the obligation arising from the law of contract, a condition of a policy requiring the cooperation and assistance of the assured in opposing a claim or an action lodged against him by an injured person is material to the risk and of the utmost importance in a practical sense. Without such cooperation and

assistance the insurer is severely handicapped and may in some instances be absolutely precluded from advancing any defense. Of course, as stated some years ago by Judge Cardozo, a cooperation clause may not be expanded to require the assured "to combine with the insurer to present a sham defense." (*Coleman* v. *New Amsterdam Cas. Co.*, 247 N. Y. 271 [160 N. E. 367, 72 A. L. R. 1443].) At the same time, however, it cannot be contracted to exclude a fair statement of the facts. The insurer is entitled to know from its assured the true facts (of which he may have knowledge) underlying an accident and upon which the injured person bases his claim in order that it may determine for itself, in the light of such information, whether it should contest or attempt to settle the claim. ■ Our examination of many authorities indicates the general rule to be that under a cooperation clause the assured is required to give a fair and frank disclosure of information reasonably demanded by the insurer to enable it to determine whether there is a genuine defense. (*Coleman* v. *New Amsterdam Cas. Co., supra; Francis* v. *London G. & A. Co.*, 100 Vt. 425 [138 Atl. 780] ; *Seltzer* v. *Indemnity Ins. Co.*, 252 N. Y. 330 [169 N. E. 403] ; *Finkle* v. *Western Auto. Ins. Co.*, 224 Mo. App. 285 [26 S. W. (2d) 843].) Many other decisions to the same effect might be cited. In *Buffalo* v. *United States F. & G. Co.*, 84 Fed. (2d) 883, 885, it is stated: "The company is entitled, however, to an honest statement by the insured of the pertinent circumstances surrounding the accident, as he remembers them. Lacking that, the company is deprived of the opportunity to negotiate a settlement, or to defend upon the solid ground of fact. Nothing is more dangerous than a client who deliberately falsifies the facts."

The subject receives the following treatment in *Allegretto* v. *Oregon Auto. Ins. Co.*, 140 Or. 538 [13 Pac. (2d) 647, 648] : "We are convinced that the willfully false statement of Harris constituted a breach of the cooperation clause of the policy. It was his contractual obligation to make a full, fair and complete disclosure of the facts relative to the automobile accident in order to enable the insurance company to determine whether the claim should be contested. Cooperation, within the meaning of the policy, does not mean that the insured is to aid and assist the insurer in the maintenance of a sham defense. It does, however, imply good faith.

The insured is not obliged to keep his mouth closed merely because an insurance policy is involved. When he does speak, however, it must be to tell the truth. When the misrepresentation concerns a material matter and substantially affects the rights of the insurer, there is unquestionably a breach of the policy.''

■ It is generally established, and we shall not pause to refer to the authorities, that what constitutes cooperation (or the lack of it) on the part of the assured, within the meaning and effect of a cooperation clause, is ordinarily a question of fact. This is so because a dispute normally exists as to the actual statements and conduct of the assured in the premises or because of the existence of an uncertainty as to the intent or motive underlying his statements or conduct. But where, as here, the evidence addressed to the failure to cooperate is not materially in dispute and it is conceded on all sides that the assured, who was operating the truck at the time of the accident, repeatedly and wilfully misrepresented to the insurer over a period of five months the actual conditions prevailing at the time of the accident in the matter of the identity of the operator, we are of the opinion that the issue became one of law and that the trial court therefore correctly concluded as a matter of law that the assured's conduct constituted a breach of the cooperation clause of the policy warranting judgment for the insurer notwithstanding the verdict. (*Allegretto* v. *Oregon Auto. Ins. Co., supra;* *United States Fid. & G. Co.* v. *Wyer,* 60 Fed. (2d) 856; *Buffalo* v. *United States F. & G. Co., supra.*) We are satisfied that under circumstances such as are here involved the problem is not the credibility of the evidence but rather the legal consequence thereof. The evidence narrated above warrants but one conclusion, viz., that the assured breached the cooperation clause of his policy by knowingly, wilfully and repeatedly misrepresenting the identity of the person driving the truck at the time of the accident—a fact unquestionably material to the insurer in its investigation and subsequent determination whether to settle or contest any claim arising out of such accident.

■ But, the appellants assert, this does not furnish a complete solution to the problem. They contend that even an intentional breach of a cooperation clause, such as we have here, does not serve to relieve and exempt the insurer

from liability under its policy for an accident as to which there has been such breach, unless and until the insurer can establish that it was prejudiced thereby. In support thereof they urge that inasmuch as the so-called "omnibus clause" of the policy extended its coverage to any person operating the truck with the assured's permission, it was immaterial to the risk whether the assured or Davis was driving at the time of the accident and that the repeated false statements of these two persons over a period of several months that Davis was driving with the permission of the assured (who was continually represented as not being present, when in fact the assured was both present and driving) in no way added to the burden of the insurer inasmuch as it was answerable for the conduct of either person while operating the truck. Particularly is there a lack of prejudice shown, it is asserted, because of the presence of certain preliminary reports to the insurer by its investigators that the matter had best be settled as "there is very little defense that we can offer in this case".

Whether it is indispensable that an insurer make a showing of prejudice resulting from breach of a cooperation clause in order to relieve itself from liability for an accident, is a question upon which there is an absence of unanimity. The Coleman case, (N. Y.) *supra,* is to the effect that prejudice need not be shown. (See, also, *Hunt* v. *Dollar,* 224 Wis. 48 [271 N. W. 405].) There is however, respectable authority which requires the insurer to establish that the assured "failed to cooperate with it in such way as to prejudice it". (*Francis* v. *London G. & A. Co., supra.*)

We do not find it necessary to here definitely determine whether the insurer must make such a showing of prejudice. While it is true that it was so indicated in *Hynding* v. *Home Acc. Ins. Co., supra,* upon which case the appellants strongly rely, we are satisfied upon a reading of the decision therein that the subject was there only briefly and incidentally discussed and was unnecessary to the disposition of that cause. The sole issue in that case was whether an insurer might set up as against the *injured person* the defense of breach of the cooperation clause by the assured. Upon this issue it was held that the weight of authority supported the conclusion that in this respect the injured person was in no better position than the assured and that it was therefore error

for the trial court in that case to *strike out* the insurer's defense based on breach of the cooperation clause. It was not indispensable that the subject of the presence or absence of prejudice resulting therefrom be discussed and, as already stated, it received only passing and incidental attention. Moreover, it was there indicated that prejudice sufficiently appeared.

In declining to now definitely determine whether the insurer must make a showing of prejudice resulting from breach of the cooperation clause by the assured, we do so for reasons similar to those announced in *Purefoy* v. *Pacific Auto. Indem. Exch.*, 5 Cal. (2d) 81, 87 [53 Pac. (2d) 155] (which decision is later in point of time than that in the Hynding case, *supra,* relied on by the appellants). We there disposed of the contention by declaring: "Appellant contends that in an action brought by the injured person against the insurance company, before it may rely on a breach of condition to avoid liability it must appear that it has been prejudiced by the breach. Respondent contends that our statement in *Hynding* v. *Home Acc. Ins. Co.*, 214 Cal. 743 [7 Pac. (2d) 999, 85 A. L. R. 13], to the effect that the violation of the condition by the assured cannot be a valid defense against the injured party unless in the particular case it appears that the insurance company was substantially prejudiced thereby, was unnecessary to the decision, and should be disapproved of in the instant case, as it is contrary to the great weight of authority in other jurisdictions. (*Coleman* v. *New Amsterdam Casualty Co.*, 247 N. Y. 271 [160 N. E. 367, 72 A. L. R. 1443, note p. 1446, see, particularly p. 1499]; *Clements* v. *Preferred Acc. Ins. Co.*, 41 Fed. (2d) 470 [76 A. L. R. 17, note, p. 23, see, particularly p. 201]; note, 85 A. L. R. 20, particularly p. 70; *St. Louis Architectural Iron Co.* v. *New Amsterdam Casualty Co.*, 40 Fed. (2d) 344, *certiorari* denied, 282 U. S. 882 [51 Sup. Ct. 86, 75 L. Ed. 778; *Jefferson Realty Co.* v. *Employers' Liability Assur. Corp.*, 149 Ky. 741 [149 S. W. 1011].) Respondent contends that as liability insurance is not compulsory, but voluntary, effect must be given to express conditions between the parties to the contract of insurance, as in the case of other types of contracts, without a showing of prejudice.

"We are not disposed at this time to enter upon a further consideration of the conflicting decisions as to whether preju-

dice must be shown, for we are of the view in the instant case, as we were in the Hynding case, *supra,* that prejudice sufficiently appeared, . . . ''

The decision in the Purefoy case then proceeds to point out that prejudice must be presumed from the failure of the assured therein to notify the insurer of the accident for a period of a year and three months (though it learned of the accident from the injured person three and one-half months thereafter) because such conduct precluded prompt investigation of the accident. It was also stated to be immaterial that the assured after giving such belated notice offered to cooperate and that counsel for the injured person gave the insurer full opportunity to defend, of which it did not avail itself. The insurer was said to be ''entitled to rely on a substantial breach of so material a condition of its policy.''

So it is in the present case. We are satisfied from an examination of the record that as matter of law prejudice must be presumed (if prejudice be essential to the insurer's defense) from the substantial and wilful breach by the assured of the material cooperation clause of the policy. The matter is aptly summed up in a memorandum opinion filed by the trial court at the time of entering judgment for the respondent insurer notwithstanding the verdict for the appellants. The trial judge stated, in part: ''The misrepresentations were not mere matters of opinion nor of a nature which could be excused upon the ground of forgetfulness, mistake, or the like. They were wilful, deliberate and false and made with the intention on the part of Davis and McClure to deceive in order to serve their own purposes. They concerned essential facts in relation to the operation and handling of the car at the time of the collision, the parties present and surrounding circumstances as to which the insurer was under its contract, entitled to a full, fair and complete disclosure. A co-operation clause binds the insured to the exercise of good faith and when he speaks concerning the facts of the accident it must be to tell the truth. To wilfully misstate or conceal facts in such a case is clearly not co-operation or assistance; it is exactly the opposite. Was it, then prejudicial? I see no escape from the conclusion that under all the circumstances here prejudice naturally, inherently and necessarily existed. The insurance company had taken a

formal position as to the facts from which it could not recede without great disadvantage. The answer bearing all the forms of verification was on file. The false statements had been made to the traffic officer, the investigator and others. A false plea had been entered before the justice and a false writing subscribed as a report. When the true facts were disclosed, the company had to exactly reverse its position with regard to essential facts and virtually proclaim their parties and chief witnesses to be liars and wholly unworthy of belief. Practically its only props were struck from under it. Better a great deal that there had been an absolute refusal to tell the facts at all than that it should have been deceived into taking a false position and then suffering the disadvantage and detriment of confessing it, thereby utterly destroying the credibility of the principal witnesses to the facts upon which it relied in defense. I am of the opinion that damage and prejudice inheres in and must be presumed to exist in such a case. Hence it is a matter of law and not of fact; a problem for the court and not for the jury.''

The fact that the insurer was for several months kept in ignorance that its assured (previously twice convicted of reckless driving) was the operator of the truck undoubtedly misled the insurer in its investigation of the accident and may well have deterred it from seeking to settle the appellants' claims, which it may well be presumed it would have attempted to settle if fully and truthfully apprised of all the facts, including the fact that its assured was a "hit and run" driver, a matter that undoubtedly would weigh heavily with a jury and would suggest settlement. The decision in the Purefoy case, *supra*, is to the effect that prejudice may be presumed from a failure to cooperate which interferes with and precludes a proper and prompt investigation of the accident.

Moreover, had the insurer proceeded to defend on behalf of its assured, it faced the spectre of having its principal witnesses denounced in open court as perjurers in view of the "about-face" in their stories, reflected in the original actions by two verified but inconsistent and contradictory answers to the complaints of the respective injured persons. The insurer before withdrawing from the defense of the actions was not required at its peril to anticipate that no reference would be made upon the trials thereof to the falsity of the

prior assertions of the two principal defense witnesses. At the time the insurer withdrew because of the assured's breach of the cooperation clause, it was warranted in reasoning that the trials would serve to expose its witnesses as perjurers. The reasonableness of such an assumption now stands demonstrated by the record in this case wherein are included portions of the testimony adduced upon the trials of the original actions for damages from which testimony it appears that the principal defense witnesses McClure (the assured) and Davis there testified that the assured was actually operating the truck whereas the testimony of the police officer (who came upon the scene of the accident) disclosed that Davis then and there stated to the witness that he (Davis) was operating the truck when the collision occurred. The answers also reflected such inconsistency in the story of the assured and Davis.

The facts involved in the Oregon case of *Allegretto* v. *Oregon Auto. Ins. Co.*, cited above, are quite similar to those of the present case. In that case, as here, the assured falsely represented that another was driving the automobile at the time of the accident. On such statement an answer was prepared and filed. Shortly prior to the trial the true facts were learned and the answer was accordingly amended. The insurer then disclaimed liability but conducted the defense (unsuccessfully) under a reservation of its right. In the subsequent action against the insurer, both sides moved for a directed verdict. The motion of the plaintiff (injured person) was granted and the insurer appealed. The judgment was reversed. Following the statement, quoted at length above, that it is the contractual obligation of the assured to make a true and complete statement of the facts, it was held, in effect, that the motion of the insurer should have been granted upon the ground that the assured's misrepresentation of a material fact constituted a prejudicial breach of the cooperation clause as a matter of law. In so concluding, the opinion therein states ''can it reasonably be said that the insurance company's rights were not substantially prejudiced when it was obliged to file an amended pleading which had the effect of apprizing the jury of the fact that Harris has not told the truth in the first instance? . . . The insurance company was the victim of the fraud and deception of one who had agreed to 'render to the company

all cooperation and assistance within his power except in a pecuniary way.'" This conclusion was announced even though "so far as the liability of the insurance company is concerned, it was immaterial, under the terms of the policy, whether Harris or Akre was driving the car . . ." ▮ In other words, the insurer is entitled to a truthful statement of the circumstances of an accident from its assured even though under a so-called "omnibus clause" it would equally be liable for the negligence of another, if such other actually operated the automobile at the time of the accident and had not been wilfully misrepresented by the assured as being the operator at such time. As we have already indicated, the identity of the driver might well constitute a material factor in the insurer's consideration and determination of the problem of settling or opposing the injured person's claim. ▮

Nor do we think that preliminary reports of the insurer's investigators tending to indicate a possible lack of defense on the merits to an injured person's claim, precludes the insurer from availing itself of a defense based on a substantial breach of the cooperation clause. We are not now in a position to conjecture as to what settlement or defense on the merits the insurer may have worked out had it been originally fully and truthfully advised by the assured and had it not been forced to withdraw because of its assured's false statements. The notice of withdrawal was timely and adequate in scope.

▮ In conclusion, we note the appellants' contention that nowhere in the policy is there a forfeiture clause and that inasmuch as forfeitures are not favored either in law or equity none should be here enforced. The case of *Finkle* v. *Western Auto. Ins. Co., supra,* at page 846, suggests an answer to the contention. It there appears: "Nor is there any doubt about the contention of counsel for plaintiff that courts abhor forfeitures, and refuse to read such a drastic provision into a policy of insurance when the parties themselves have not unmistakably inserted it therein. In such an instance as this, however, we do not understand that any forfeiture of the policy is involved. If the insurer is fortunate enough to escape liability, it is not necessarily by a forfeiture of the policy, for the policy may well remain in full force and effect as to those losses sustained by the assured where the conditions of the policy have been met, while a recovery may be

defeated as to a particular loss in connection with which the assured was remiss in the performance of his obligations under the contract.

"By this we mean that the condition of the policy requiring cooperation by the assured is in the nature of a condition precedent to liability on the company's part for the loss growing out of a claim with the disposition of which the assured's assistance is demanded; and we see no reason why we should hold that a breach of such condition in a given instance should have the effect of nullifying and vitiating the contract for all time and purposes. In other words, the failure of the assured to aid in securing information and evidence when requested by the company will not terminate the company's entire liability as a matter of law, the policy not expressly making such failure a cause of forfeiture, but, in an action by the assured for indemnity to cover a particular loss sustained, his failure will be evidence for the company on the vital question of whether he was guilty of such a breach of his contract as to serve to defeat his action, and to relieve the company from liability therein."

Applying this reasoning to the case now before us we find that the insurer in its written notice of withdrawal to the assured merely expressed its "refusal to protect [the assured] under their above numbered policy *for claims arising out of the accident referred to in the said actions.*" The answer filed in each of these actions by the insurer in response to the complaint of the respective appellants alleged that in so far as the assured was concerned "no insurance coverage existed . . . *in respect to any of the matters alleged in said complaint.*" It is obvious from the foregoing that the insurer was merely disclaiming liability for the accidents to the appellants and was not declaring a forfeiture of the policy. The reasoning of the case last quoted from is therefore applicable. (However, even if the insurer were seeking a forfeiture of the policy generally, so long as it is entitled to avoid liability for this particular accident, it is questionable whether the appellants would be in a position to object thereto.)

The Purefoy case, *supra*, 91, reaches a similar conclusion in the following manner: "The policy of liability insurance did not insure Austin only against liability on account of this particular accident, but also against liability for other ac-

cidents during the life of the policy, which was one year from December 15, 1929. We are of the view that by retaining the premium the insurer may have waived the right to declare the policy forfeited, and thereby have protected Austin as to other accidents during the life of the policy, but that it did not waive the right to rely on the breach of condition to defeat liability as to this particular accident.''

The record and many briefs herein, including the several *amici curiae* briefs, have been examined and we are of the view that sufficient has been said on the many arguments expounded by counsel. It is impossible to here refer to and discuss the many cases cited in the several briefs.

The judgment is affirmed.

Shenk, J., Curtis, J., Langdon, J., Seawell, J., and Edmonds, J., concurred.

HOUSER, J., Dissenting.—I dissent. Notwithstanding the possible trend of precedents to the contrary, I am unwilling to subscribe to a doctrine which either will, or may, encourage the perpetration of fraud, or afford a favorable opportunity to unscrupulous insurance companies (if any) or to their agents, through collusion with an assured, to defeat the just rights of one who may be injured through the negligence of an insured person. It is obvious that, under the rule that has been announced in the majority opinion, as a consequence of a possible collusion between an insurance company and an impecunious owner of an automobile, an insured person might be induced to ''cooperate'' with an insurance company even up to any moment of a trial, and then, under some pretext, or for no reason whatsoever, either fail or decline to continue in his ''cooperation'',—with the result that, however meritorious the cause of action of a plaintiff might be, the insurance company would become absolved from liability, to the irreparable loss of the injured person.

I am of the opinion that, by virtue of the exercise of police power, not only is the public entitled to assert and to maintain an interest in every automobile insurance policy, but also that, by its contract, an insurance company impliedly holds out to the world an assurance that it will answer for the actionable negligence of the insured person. Likewise, and in consequence, am I convinced that until and including

the instant when an accident insured against may occur, the contract of insurance should be interpreted as one made not only for the benefit of the person with whom such contract has been entered into, but also for the benefit and protection of the third person who may be injured in such accident; furthermore, that to permit an insurance company, because of its agreement with its assured to that legal effect, to evade liability that already may have ensued against it, solely for the reason that thereafter the assured has failed to ''cooperate'', amounts to nothing less than legal encouragement and an implied invitation to commit a fraud as far as the rights of the injured person are concerned. Such an agreement should be condemned as contrary to public policy and adjudged wholly void. In other words, my conclusion is that, after an accident has occurred, by no act, omission, or agreement of any kind, by or in behalf of the parties to the contract, should the assumed rights of interested third persons therein be adversely affected. The following authorities have at least an indirect bearing upon the situation herein presented:

In the case entitled *Stovall* v. *New York Indemnity Co.*, 157 Tenn. 301 [8 S. W. (2d) 473, 72 A. L. R. 1368], the court said: '' . . . in Blashfield's Cyclopedia of Automobile Law, (1927) vol. 3, p. 2637, the case of *Dickinson* v. *Maryland Casualty Co.* [101 Conn. 369 (125 Atl. 866, 41 A. L. R. 500)], *supra,* is referred to as holding that 'where an automobile liability insurance policy extended indemnity to third parties driving with assured's permission, and permitted suit against the insurer by persons injured by the operation of the car, slight deviations, by one permitted by the insured to drive home to change his clothes, from the route to the home of the driver, does not destroy the insurer's liability for injuries to a guest of the driver'.''

Referring to the Dickinson case, the court proceeded to say: ''In construing the policy, we think the Supreme Court of Errors of Connecticut correctly placed emphasis upon the purpose of the named insured to protect any person injured by the operation of the car by giving him a cause of action against the insurer, in the event of the insolvency or bankruptcy of the person responsible in law for injuries inflicted in the operation of the car. *This object or purpose is in accord with the trend of public opinion, which, in some juris-*

*dictions, has resulted in legislation requiring owners and operators of automobiles to carry insurance for the protection of persons who may be injured by their operation."* (Emphasis added.)

That the rights of any person lawfully using the highway who may be injured by the negligent operation of an automobile by another should be of paramount importance, in an action brought by such injured third person to collect damages resulting from his injuries, is borne out by the fact (commented upon in the case just cited) that in several jurisdictions the legislatures of the respective states have enacted compulsory automobile insurance laws. Such laws have been held to be valid legislative enactments, under the police power of the state. (See Huddy, Cyclopedia of Automobile Law, ninth edition, vol. 13–14, p. 302, and cases there cited.)

Thus in the work of Couch, Cyclopedia of Insurance Law, vol. 5, p. 4199, in discussing the compulsory automobile insurance law of New Hampshire, the author says: " . . . the New Hampshire court, in passing upon the questions submitted to it, declared that the legislature, under its authority over public highways and its power *to provide for the public safety,* could lawfully pass a general requirement that motor vehicles may be operated on the public highways only when adequate provision has been made for compensation to persons injured by negligent operation; . . . " (Emphasis added.)

And in the case entitled *Wheeler* v. *O'Connell,* (Mass.) 9 N. E. (2d) 544, the court said: "The purpose of the compulsory motor vehicle insurance law . . . is to provide compensation *to persons injured through the operation of the automobile insured by the owner.* In speaking of the grounds for justification of the statute in question, it was said in *Opinion of the Justices,* 251 Mass. 569, 596 [147 N. E. 681, 694]: 'The most important is the great uncompensated damage now caused by motor vehicles to innocent travelers upon the public ways.' And it has been pointed out by this court in many cases that the protection of the traveler on the public ways is the fundamental basis of the statute. [Citing cases.]" (Emphasis added.)

Also in the case entitled *In re Opinion of the Justices,* 251 Mass. 569 (147 N. E. 681, at pp. 693, 694), the court

discussed at length the reasons underlying legislation providing for compulsory automobile insurance, and commented as follows:

"The power of the General Court to regulate travel over the public ways of the commonwealth for the general welfare is extensive. It may be exercised in any reasonable manner to conserve the safety of travelers. No one has a right to use streets and other public places as he chooses without regard to the presence of others. It is an underlying conception of streets and highways that they shall at all times be reasonably safe and convenient for public travel and that travelers thereon in the exercise of due care may be secure from preventable danger. Numerous statutes to that end have been enacted from early times to the present. All highways now are laid out and established by public authority. . . . The requirement that every owner before being allowed to register his motor vehicle shall provide security for the discharge of his liability for personal injuries or death resulting from the presence of such motor vehicle on the public ways cannot be pronounced unreasonable. It furnishes a degree of assurance of compensation to those rightly and carefully using the ways and injured by the carelessness of operators of motor vehicles. It may be thought that an indirect result of such regulation will be to cause the exercise of greater care on the part of such operators and of higher caution on the part of owners of motor vehicles in refusing to intrust them to careless operators. The requirement for security for the payment of the legal claims arising from personal injuries caused on highways by motor vehicles is an extension of the police power into a new field so far as we are aware, but in our opinion it falls within the limits of the constitutional power of the General Court. It may be justified on several grounds. The most important is the great uncompensated damage now caused by motor vehicles to innocent travelers upon the public ways. It is a part of the declaration of Rights of our Constitution that:

" 'Every subject of the commonwealth ought to find a certain remedy, by having recourse to the laws, for all injuries or wrongs which he may receive in his person, property, or character.' Article 11.

"Another ground upon which the validity of the proposed statute may rest is that the motor vehicle is of itself a dangerous instrumentality. Unless kept in good repair and equipped with adequate brakes and then driven on public ways with a high degree of care and skill, it is bound to become a source of imminent danger to other travelers. Chief Justice Shaw said in *Commonwealth* v. *Alger,* 7 Cush. 53, 84, 85:

"'It is a settled principle, growing out of the nature of well-ordered civil society, that every holder of property, however absolute and unqualified may be his title, holds it under the implied liability that his use of it may be so regulated that it shall not be injurious to the equal enjoyment of others having an equal right to the enjoyment of their property, nor injurious to the rights of the community.'

". . . It has commonly been thought that there is no more certain way of securing attention to the safety of human beings than by holding those responsible for dangers to heavy and certain liability for injuries arising therefrom. [Arizona Employers' Liability Cases], 250 U. S. 400, at 432 [39 Sup. Ct. 553, 63 L. Ed. 1058, 6 A. L. R. 1537]. Legal liability without financial responsibility is a barren right to one who sustains injury by the wrongful act of another. A peremptory requirement that, before one brings a dangerous instrumentality into public places, the owner must first provide adequate security that those who suffer personal injury through the negligent use thereof shall be assured of recompense would be no greater interference with fundamental rights than the instances just cited. The operation of such an instrumentality in public places is not a natural right. It is subject to reasonable regulation for the benefit of the general public. . . . " To the same effect is *Re Opinion of the Justices,* 81 N. H. 566 [129 Atl. 117, 39 A. L. R. 1023].

In the face of the provisions of the several statutes to which reference has been had in the foregoing quotations, the reasoning employed by the different appellate tribunals in the cited cases, and the judicial pronouncements in connection therewith, it would seem most improbable that, by reason of a contract provision like the one here in question which might be contained within a policy of insurance,—on the happening of an accident which had occurred through and by reason of the negligent act of the assured—an insurance

company would be allowed to evade liability therefor on the ground that, after the accident had occurred, the assured had either refused or failed to ''cooperate''.

Furthermore, as tending toward a recognition and consequent application of a doctrine such as that which hereinbefore has been suggested and which to my mind should prevail herein, see the case of *Malmgren* v. *Southwestern A. Ins. Co.*, 201 Cal. 29 [255 Pac. 512].

Rehearing denied. Houser, J., and Seawell, J., voted for a rehearing.